UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BONDAR INSURANCE GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 19 C 3188 |
| | ) |
| STARR SURPLUS LINES INSURANCE | ) |
| COMPANY and ENGLE MARTIN & | ) |
| ASSOCIATES, LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Bondar Insurance Group, Inc. ("Bondar") brings this diversity action against Defendants Starr Surplus Lines Insurance Company ("Starr") and Engle Martin & Associates ("Engle Martin"), asserting state law claims for defamation and tortious interference with prospective economic advantage. Dkt. # 12. Before the Court is Defendants' joint motion for summary judgment. Dkt. # 74. For the following reasons, Defendants' motion is granted-in-part and denied-in-part.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

Bondar is an insurance broker and specializes in assisting trucking companies with obtaining insurance coverage in Illinois. Starr is an insurance company that sells, among other insurance products, insurance policies for trucking companies. Engle Martin is an independent insurance adjusting company handling insurance claims on behalf of insurance companies and brokers. Husky Trans, Inc. ("Husky") and MTT Trucking were interstate trucking companies owned by Lilian Gaibu.

Starr issued an insurance policy to Husky for a policy term from February 23, 2018, to February 23, 2019, providing coverage for Husky's interest in trucking vehicles and equipment.[1] The policy was an "annual reporting" policy, meaning Husky was required to provide Starr with an updated schedule identifying its covered vehicles on an annual basis and was not required to notify Starr when a new vehicle was acquired mid-term. If a claim was made for a vehicle that was not listed on a previous schedule, Starr would look to the schedule filed when the policy went into effect and then ask for proof that the vehicle was acquired after the inception date of the policy.

Adam Goldstein is employed by Engle Martin and was the insurance adjuster assigned to act on behalf of Starr for insurance claims made by Husky. Goldstein's duties as an adjuster included investigating claims, inspecting damaged equipment, preparing damage appraisals, and securing pertinent documents, and reporting that information to Starr to allow it to decide how to move the claim investigation forward.

---

[1] Starr cancelled Husky's policy on November 30, 2018, because Husky had eight losses in six months.

2

On or about September 20, 2018, Husky made an insurance claim for property damage to a 2016 Coronado tractor truck and its trailer and cargo. Goldstein spoke directly with Gaibu about the claim.

Gaibu testified that, in November 2018[2], Goldstein told him that Bondar never added the tractor truck involved in the September 2018 accident to the Starr insurance policy and, as a result, Husky's insurance claim might not be covered. When asked by Bondar's former owner whether Bondar was responsible for the denial of Husky's claim, Gaibu emailed the owner, among others, stating:

> "I had over the phone conversation with Adam where he told me Bondar never add truck to the policy and ask me if I have proof that I requested Bondar to add the truck, what I told him yes I have proof and he asked me to email him and I did and you were cc on that email."

Dkt. # 76-2, at 60 (errors in original). The words purportedly spoken by Goldstein to Gaibu in the November 2018 phone conversation form the sole basis for Bondar's claims against Defendants for defamation and tortious interference.

On December 19, 2018, Goldstein sent Husky a letter denying Husky's claim for the September 2018 accident ("Denial Letter"). According to the Denial Letter, Starr declined to pay Husky's claim for the tractor truck because the tractor truck was allegedly not listed on the policy schedule. Starr has also indicated that it denied coverage because Husky submitted inconsistent and contradictory information

---

[2] Bondar disputes that the timeframe for the conversation is limited to November 2018, citing Gaibu's deposition testimony. That testimony, however, confirms the correct timeframe is November 2018. Gaibu originally said it was December, but immediately thereafter clarified that it was November. *See* Dkt. # 76-2, at 60–61. Gaibu reiterated that it was November later in his deposition. *Id.* at 71.

regarding Husky's interest in the truck at the time of the September 2018 accident. *See* Dkt. # 80-4[3], ¶ 31 ("Starr admits that it denied coverage . . . pursuant to the provisions of the policy, including but not limited to [Gaibu's] failure to provide proof of insurable interest, [Gaibu's] representation that it owned the subject tractor and then providing documentation that was false or intended to conceal or misrepresent the ownership of the subject tractor in an attempt to obtain insurance . . . .").

At some point prior to sending the Denial Letter, Goldstein asked Husky to provide documentation of its insurable interest in the tractor truck. On December 20, 2018, the day after the Denial Letter was sent, Bondar emailed Gaibu and asked him to provide information about the date Husky acquired the tractor truck so it could pass the information on to Starr. Gaibu responded that day and provided a purported bill of sale for the tractor truck.

During the months following the December 20, 2018 email from Bondar, Goldstein, Husky, and Bondar continued to exchange information regarding the claim for the September 2018 accident. Goldstein continued to seek documentation of Husky's interest in the tractor truck. In response, Husky, directly or through Bondar, produced: (1) the back page of the tractor truck title, showing Truck Life, a company owned by Gaibu but not insured by Starr, owned the tractor truck at the time of the

---

[3] A lawsuit was filed by Husky against Starr in the Circuit Court of Cook County, Illinois, Case No. 2019 CH 8601. Dkt. # 80-4, Exhibit 17 to Defendants' Local Rule 56.1 Statement of Facts, is a copy of Starr's answer and affirmative defenses to Husky's third amended complaint. The lawsuit was subsequently dismissed for want of prosecution on December 17, 2021. Dkt. # 80-5, at 2.

4

accident[4]; (2) the front of a $123,000 check dated July 20, 2018, purportedly showing a payment from Husky to Truck Life to purchase the tractor truck[5]; and (3) a lease, purporting to show that Truck Life had leased, not sold, the tractor truck to Husky. On January 4, 2019, Bondar forwarded a copy of the bill of sale Husky previously provided.

Gaibu testified that he took his business away from Bondar because Goldstein told him the lack of coverage was Bondar's fault and Bondar was not doing its job. Bondar denies Goldstein used those words. Gaibu also testified that, based on what Goldstein told him, he spoke with another one of Bondar's customers, known as Tommy Freight, regarding the issues he had with his claim not being covered. However, Gaibu did not indicate who he spoke to or when the conversation took place. Bondar's owner, Paul Bondar, testified that he believed Tommy Freight stopped doing business with Bondar because of what Gaibu told Tommy Freight.

Husky and MTT Trucking had their authority to operate as motor carriers involuntarily revoked by the U.S. Department of Transportation Federal Motor Carrier Safety Administration on August 19, 2019, and June 24, 2019, respectively. Gaibu testified that Husky remains in operation as a dispatch service, and he also owns a company known as STI, which is an authorized motor carrier.

---

[4] Bondar disputes that the title contains any information regarding the ownership of the truck at the time of the accident but admits that the document reflects Truck Life purchased the truck on March 4, 2017, and contains no information regarding subsequent sales. The title was not included as an exhibit to Defendants' statement of facts.

[5] There is no copy of the back of the check to show it was negotiated.

On January 1, 2021, Bondar was sold to Alera Insurance Group. The purchase price was calculated at 10.5 times the earnings before interest, taxes, depreciation, and amortization ("EBITDA") for the calendar year 2020. Bondar's expert, Michael Patkar, opined that the sale price was over $1.1 million less than what it should have been. Bondar argues that, had it not been for Defendants' defamation and tortious interference, it would have received premium income from Husky, MMT Trucking, and Tommy Freight in 2020, which would have increased the sale price of the company.

Based on these facts, Bondar brought claims against Defendants for defamation and tortious interference with prospective economic advantage. Defendants now move for summary judgment on all claims.

## **LEGAL STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (cleaned up). In doing so, the Court gives the

non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## DISCUSSION

Defendants argue summary judgment is warranted on Bondar's claims for defamation and tortious interference with prospective economic advantage. As to the defamation claim, Defendants contend that even if Gaibu's testimony about what Goldstein said is given credence, the alleged words are protected by a qualified privilege.[6] As to the tortious interference claim, Defendants argue Bondar cannot show that Defendants intentionally and without justification interfered in Bondar's economic expectancy.

Defendants also assert summary judgment is appropriate because Bondar cannot prove its claimed damages with a reasonable degree of certainty, and because the operating certificates for both of Gaibu's trucking companies were revoked by August 2019, neither company would have generated premium revenue in 2020, regardless of anything that may have been said by or on behalf of Defendants. We address each argument in turn.

---

[6] After reviewing the parties' summary judgment submissions, Judge Dow found that both parties analyzed the issue of qualified privilege under the incorrect standard. The parties were given the opportunity to file supplemental briefs analyzing the proper standard, which they have now done.

## I. Defamation

Qualified privilege in Illinois defamation law is based on a policy of protecting honest communications of misinformation in certain favored circumstances to facilitate the availability of correct information. *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 156 Ill. 2d 16, 24 (1993). A privileged communication is one that might be defamatory and actionable except for the occasion on which, or the circumstances under which, it is made. *Id.* Qualified privilege enhances a defamation plaintiff's burden of proof. *Id.* In the absence of qualified privilege, a plaintiff need only show that the defendant acted with negligence in making the defamatory statements in order to prevail. *Id.* Once a defendant establishes a qualified privilege, however, a plaintiff must show a direct intention to injure another or a reckless disregard of the plaintiff's rights and of the consequences that may result to the plaintiff. *Id.* at 30. Stated otherwise, "an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." *Id.* The issue of whether a qualified privilege exists is one of law, but whether the defendant abused the privilege in making the allegedly defamatory statement is a question of fact. *Pompa v. Swanson*, 2013 IL App (2d) 120911, ¶ 27.

The Illinois Supreme Court has adopted the approach of the Restatement (Second) of Torts to determine whether a qualified privilege exists. *Kuwik*, 156 Ill. 2d at 28–29. Under that approach, conditionally privileged occasions are divided into three

8

classes. *Id.* at 29. Those classes are: (1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved; and (3) situations in which a recognized interest of the public is concerned." *Id.* (citation omitted). "In determining whether a qualified privilege exists, a court is to consider only the general type of communication involved, not the particular communication involved in the case." *Naleway v. Agnich*, 386 Ill. App. 3d 635, 640 (2d Dist. 2008).

Simply put, the answer to the threshold question of whether a qualified privilege exists here is "yes". Defendants correctly argue that Goldstein's allegedly defamatory statements fall within the first and second qualified privilege categories, and Bondar does not make any convincing argument to the contrary. The defamatory statement was communicated during a phone call regarding the adjustment of an insurance claim, implicating the interests of both Goldstein, the adjuster, and Gaibu, the insured. Thus, the dispositive question before the Court is whether the privilege was abused.

Although the question of whether a defendant abused a qualified privilege is typically a fact question, "just because an issue is generally one for a trier of fact to resolve does not mean that a defamation plaintiff is automatically entitled to present his case to a jury when a qualified privilege applies. A court may determine that as a matter of law insufficient facts are alleged . . . to show an abuse of the applicable qualified privilege." *Tamburo v. Dworkin*, 974 F. Supp. 2d 1199, 1215 (quoting *Huon v. Beatty*,

9

2011 WL 91717454, at *6 (Ill. App. Ct. 2011)). At summary judgment, the burden is on Bondar to "come forward with actual evidence creating an issue of fact" as to an abuse of that privilege. *Vickers v. Abbot Lab'ys*, 308 Ill. App. 3d 393, 404 (1st Dist. 1999).

There is no evidence from which a reasonable jury could conclude that Goldstein directly intended to injure Bondar with his alleged defamatory statements. So, to prevail on its claim that the qualified privilege was abused, Bondar must show "a reckless disregard of [Bondar's] rights and of the consequences that may result" to Bondar. *Kuwik*, 156 Ill. 2d at 30. As noted above, this can be shown by a defendant's failure to properly investigate the truth of the matter before issuing the defamatory statement. *Id.*

For example, in *Kuwik,* the plaintiff/chiropractor's bill was submitted to the defendant insurance administrator for payment. *Id.* at 21–23. In response, the plaintiff received a letter from the defendant stating the services the plaintiff rendered were "outside the scope of the practicing physician's license[]" and payment was therefore denied. In fact, the treatment rendered was not outside the scope of the plaintiff's license. *Id.* at 19–20. Because the bill was also submitted by the plaintiff's patient, the defendant's response letter was communicated to the patient. The patient showed the letter to the plaintiff and the plaintiff sued the defendant for defamation. *Id.* at 20–22.

After holding the defendant's communications were conditionally privileged, the court found a genuine issue of material fact existed where the plaintiff offered evidence

10

of the defendant's recklessness. *Id.* at 31. At a deposition, one of the defendant's employees testified that company policy required input from both the legal and medical departments when investigating physician licensing. *Id.* at 31–32. Additional evidence established that only the legal department was consulted on the matter. *Id.* As a result, the court determined a question of fact existed as to whether the defendant was reckless because company investigatory procedures clearly were not followed. *Id.*; *see also*, *e.g.*, *Giant Screen Sports v. Canadian Imperial Bank of Com.*, 553 F.3d 527, 536 (7th Cir. 2009) ("[G]enuine issues of material fact exist as to whether CIBC knew of or had reason to suspect the forgery, which indicate that CIBC's behavior in sending the letters to EDC may have been in reckless disregard of Giant Screen's rights."); *Stavros v. Marrese*, 323 Ill. App. 3d 1052, 1059 (1st Dist. 2001) (holding that a letter sent to the plaintiff's employer accusing the plaintiff of extortion abused the privilege because the "defendant knew extortion was a crime," and a reasonable jury could conclude that "defendant should have investigated more carefully . . . the definition of extortion, to determine whether plaintiff's behavior in fact amounted to this criminal behavior").

Here, Bondar argues Defendants failed to properly investigate the truth of the matter prior to issuing the defamatory statement. More specifically, Bondar contends Defendants should have investigated (1) when the truck was acquired, (2) when it was added to the policy, and (3) when it was required to be added to the policy, *before* placing the blame for denial of the claim on Bondar. Bondar argues that, had Defendants conducted such an investigation prior to blaming it for the lack of coverage,

11

and properly informed Gaibu that coverage was being denied due to a lack of ownership documentation, "this lawsuit may well have been avoided." Dkt. # 97, at 7.

Bondar places particular emphasis on Defendants' awareness of the "annual reporting" nature of the policy. And Defendants admit that, if a claim is submitted on a vehicle that was not contained on a previous schedule, the procedure is to ask for proof that the vehicle was acquired after the inception date of the policy. Defendants attempt to focus the Court's attention on the long and drawn-out process of getting the appropriate paperwork from Gaibu, and the inconsistent information he provided. Defendants say they asked Gaibu for a bill of sale for the vehicle involved in the September 2018 accident as early as October 2018, but this does not explain why, if Defendants knew that proof of Gaibu's ownership interest in the truck had been requested but not yet received, Goldstein would be so quick to claim Bondar "didn't do its job."

The Court concludes that, viewing the evidence in the light most favorable to Bondar, a reasonable jury could conclude that Defendants exhibited a "reckless disregard of [Bondar's] rights and of the consequences that may result" by not conducting a more thorough investigation before placing the blame on Bondar. Thus, genuine issues of material fact exist as to Defendants' abuse of its privilege and, at a more basic level, whether Goldstein actually published the alleged defamatory statement to Gaibu in the first instance. Defendants' motion for summary judgment must be denied as to the defamation claim.

## II. Tortious Interference

To succeed on a claim for tortious interference with a prospective business advantage under Illinois law, Bondar must prove: (1) a reasonable expectancy of entering into a valid business relationship; (2) Defendants' knowledge of the expectancy; (3) an intentional and unjustified interference by Defendants that induced or caused a breach or termination of the expectancy' and (4) damages resulting from the interference. *Evans v. City of Chi.*, 434 F.3d 916, 929 (7th Cir. 2006).

Defendants do not dispute the first two elements but argue Bondar fails to demonstrate a question of material fact as to the third and fourth elements. With respect to the third element, "a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but . . . [that] the defendant has committed some impropriety in doing so." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 485 (1998); *see also Republic Tobacco, L.P. v. N. Atl. Trading Co., Inc.*, 254 F. Supp. 2d 1007, 1011–12 (N.D. Ill. 2003) ("In Illinois, a party must allege conduct that was improper in the sense that it was accomplished by wrongful means, or was motivated by malice and not simply economic self-interest.") (cleaned up). "In the context of a suit for tortious interference with a prospective economic relationship, the term 'malicious' does not carry the ordinary meaning of vindictive or malevolent; it means intentionally and without justification." *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171 (7th Cir. 1993). "Whether conduct is malicious, therefore, turns not on

13

how 'harmful' it was, but on the intent behind and justification for it." *Bergholz v. John Marshall Law Sch.*, 2018 WL 5622052, at *9 (N.D. Ill. 2018).

Defendants say the record is devoid of any evidence that Goldstein had any personal animosity towards Bondar to support the "malicious intent" or "desire to harm" required to prove a tortious interference claim, and devoid of any actions or statements by Goldstein showing an intent to interfere with Bondar's relationship with Gaibu. Bondar responds that Goldstein's "entirely needless act of ascribing blame to [Bondar] for the truck's absence from the schedule" is an intentional and unjustified interference "even if Goldstein's explanation for the denial of the claim were otherwise justified, which it is not." Dkt. # 87, at 10.

Because there is an open question of whether Goldstein abused the qualified privilege when allegedly blaming Bondar for the improper denial of Gaibu's claim, the evidence of record, when viewed in the light most favorable to Bondar, also permits an inference that Goldstein intentionally interfered with Gaibu's relationship with Bondar. Defendants' motion for summary judgment is denied as to Bondar's tortious interference with prospective economic advantage claim.

### III. Damages

Defendants argue that, even if the Court finds an abuse of qualified privilege or tortious interference, summary judgment is still warranted because Bondar's claimed damages are wholly speculative. "Damages are speculative when uncertainty exists as to the fact of their existence, as opposed to the amount of damages." *Westlake Fin.*

14

*Grp. v. CDH-Delnor Health Sys.*, 2015 IL App (2d) 140589, ¶ 51 (cleaned up). "Lost profits by their nature cannot be calculated with mathematical precision and therefore do not have to be proven with absolute certainty; instead, the evidence needs to provide only a reasonable basis for the computation of damages." *Id.* (citing *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 361 (2002)).

According to Bondar, had it not been for Defendants' defamation and tortious interference, Bondar would have received over $100,000 in revenue in 2020 from Husky, MMT Trucking, and Tommy Freight, another trucking company and former Bondar customer. When Bondar was sold in 2021, the sale price was calculated by multiplying Bondar's 2020 revenue by 10.5. Patker, Bondar's expert, concluded Bondar's 2021 sale price was over $1.1 million lower than it should have been because of the lost revenue from these three companies.

As an initial matter, the only evidence regarding Tommy Freight is Gaibu's testimony that he told someone at Tommy Freight about the issues he had with his claim not being covered and Paul Bondar's *belief* that Tommy Freight stopped doing business with Bondar because Gaibu said he told Tommy Freight's owner what Goldstein allegedly said in November 2018. As Defendants put it, "[t]his daisy chain of hearsay is not evidence of anything, and a daisy chain of hearsay will not provide the basis for a damage calculation that can be admitted into evidence." Dkt. # 75, at 12–13. Indeed, at summary judgment, the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or

15

conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up). There is no admissible evidence from any witness from Tommy Freight as to why it did not continue to use Bondar, or if it is still in business. Bondar has failed to raise a genuine issue of fact regarding the existence of damages related to Tommy Freight. So, the Court grants Defendants' motion for summary judgment on this issue.

Central to Patker's conclusion regarding Bondar's damages is the assumption that Husky and MMT Trucking would have provided income to Bondar in 2020. However, as Defendants point out, both MMT Trucking and Husky had their authority to operate as motor carriers involuntarily revoked in July and August of 2019, respectively. Nevertheless, Bondar maintains there is a genuine dispute as to material fact as to whether it would have received commissions from Husky, MMT, or other companies owned by Gaibu in 2020, pointing to Gaibu's deposition testimony that Husky remains in operation as a dispatch service and that at least one of his other companies is an authorized motor carrier. The Court disagrees.

As the Seventh Circuit has reiterated time and again, summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schact v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). Bondar has not come forward with any evidence from which a reasonable jury could conclude that Bondar would have generated any premium income from Gaibu's companies in 2020. There is no evidence about STI, another one of Gaibu's companies, or its insurance needs, and nothing to

16

suggest Husky or MMT Trucking were operational at any point in 2020—Bondar's own expert made no attempt to verify this information. Bondar also admits that Patker had no information about the last time Husky, MMT Trucking, or Tommy Freight paid any insurance premiums. At bottom, Bondar has not put forth any facts that any company owned by Gaibu had any insurance or utilized an insurance agent. Any claim of lost revenue in 2020 would be wholly speculative; Bondar's evidence on summary judgment simply cannot establish a basis upon which 2020 damages can be calculated to a reasonable degree of certainty.

However, Bondar has demonstrated a question of fact as to whether it sustained damages in the form of the lost commissions in 2019. Gaibu testified that he took his business elsewhere because of Goldstein's conduct. Thus, a reasonable jury could conclude that Bondar would have received commissions from Husky and MMT Trucking up to the point when the companies lost their operating authority in 2019. Assuming Bondar can prove either or both of its claims at trial, its lost profits damages will be limited to losses in revenue sustained in 2019, to the extent those losses can be proven to a reasonable degree of certainty.

## CONCLUSION

Defendants' motion for summary judgment [74] is granted-in-part and denied-in-part as set forth above. Telephonic status hearing is set for September 7, 2023 at 10:40 a.m. It is so ordered.

Dated: August 15, 2023

_____
Charles P. Kocoras
United States District Judge